IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                   No. CR 08-367 MCA

SASO KIROVSKI,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's *Motion to Suppress* [Doc.35] filed on May 12, 2008. The Court held an evidentiary hearing on this motion in Albuquerque, New Mexico, on July 14, 2008, at which Defendant and counsel were present.[1] Having considered the parties' submissions, the applicable law, the evidence and arguments of counsel, and being fully advised in the premises, the Court denies Defendant's *Motion to Suppress* for the reasons set forth below.

## I.    FINDINGS OF FACT

1.    The State of New Mexico has enacted a regulatory scheme that generally requires commercial carriers entering or leaving New Mexico to stop at its ports of entry and

---

[1]At the hearing on July 14, 2008, the Court also gave the parties the opportunity to file written closing arguments by no later than August 11, 2008; that deadline was extended to September 8, 2008, at defense counsel's request, to accommodate defense counsel's delay in ordering and paying for the transcript of the hearing. Defendant filed a timely supplemental brief. The Government did not, despite the Court's instructions that the briefing was to be simultaneous, with no response or reply. [Tr. 7-14-08, at 177; Doc. 46.]

authorizes state employees assigned to those ports of entry to inspect commercial vehicles and their documentation to determine whether the vehicles, drivers, and cargo are in compliance with relevant state and federal laws regarding public safety, health, and welfare. See generally N.M. Stat. Ann. § 65-5-1 (Michie 2003).

2.      The discretion of the state personnel staffing these permanent ports of entry is limited by New Mexico statutes and regulations which define the place, scope, and duration of the safety-related inspections they may perform under the State's regulatory scheme for commercial carriers.

3.      In accordance with this regulatory scheme, the Motor Transportation Division (MTD) of the New Mexico Department of Public Safety (NMDPS) operates a permanent port of entry on Interstate 40 near Gallup, New Mexico, and New Mexico's western border with Arizona.

4.      The Gallup port of entry accommodates the use of a "PrePass System," which allows certain data relevant to documenting compliance with the State's regulatory scheme for eligible commercial carriers to be transmitted and received electronically in lieu of exchanging such information manually through a stop at the counter or credential booth of a port of entry or weigh station.

5.      Commercial truck drivers who meet the PrePass System's eligibility criteria may voluntarily sign up to participate in the PrePass System by providing certain information and agreeing to pay a fee.

6.      In this case, Defendant testified that he signed up for the PrePass System for his trucking company in February 2007. [Tr. 7-14-08, at 173-74.]

7.      For eligible carriers that have signed up to participate (including Defendant's trucking company in this case), the administrator of the PrePass System provides a transponder which emits a radio signal identifying the truck as it approaches ports of entry or weigh stations in participating states. [Tr. 7-14-08, at 16-17, 51-52, 97-98.]

8.      The Gallup Port of Entry has a receiver that detects the signal emitted by the transponder mounted in the truck and causes certain information about the truck to appear on a monitor that was staffed, in this instance, by Officer Smid of the New Mexico Department of Public Safety. [Tr. 7-14-08, at 16-17, 51-52.]

9.      In addition to the system of transponders, receivers, and monitors described above, the PrePass System includes a set of traffic signals which emit a green light (indicating that the driver does not need to stop at the port of entry) or a red light (indicating that the driver must stop at the port of entry for further inspection). [Tr. 7-14-08, at 16-17, 51-52, 97-98.]

10.     Depending on the information that the PrePass System has on file for a particular truck or trucking company and a particular State, the PrePass System calculates a "random pull-in" rate, which establishes the frequency with which the truck will be given a red light indicating that it must stop for further inspection.  [Tr. 7-14-08, at 16-17, 53-54, 98-100, 102.]

-3-

11.     The Court takes judicial notice that Officer Smid's testimony regarding the operation of the PrePass System is consistent with the information published on the PrePass System's website (www.prepass.com) and in the reported case law, see State ex rel. Dep't of Transp. v. Heavy Vehicle Electronic License Plate, Inc., 157 F. Supp. 2d 1158, 1161 (D. Or. 2001).

12.     Defendant testified that he had received red lights through the PrePass System before and was aware that he could be required to stop at ports of entry even though he had a PrePass transponder. [Tr. 7-14-08, at 162.]

13.     On January 20, 2008, at approximately 9:30 a.m., the PrePass System signaled a red light for Defendant's truck when it was approximately one mile west of the Gallup port of entry traveling eastbound on Interstate 40 in the State of New Mexico.

14.     In response to this red light, Defendant's truck exited the highway and stopped at the Gallup port of entry.

15.     At that time, Officer Smid was observing the monitor in the Gallup port of entry looking for trucks to inspect in accordance with the State's regulatory scheme for commercial carriers.

16.     Based on the red light and the information supplied on the monitor by the PrePass System, Officer Smid decided to conduct a "Level 2 Safety Inspection" of Defendant's truck.

17.     Accordingly, Officer Smid directed another staff member at the port of entry to request Defendant's logbook and take it to the lobby area of the port of entry.

18.     Soon thereafter, Defendant and his logbook appeared in the lobby, whereupon Officer Smid informed Defendant that he was going to perform a Level 2 Safety Inspection.

19.     During his initial review of Defendant's logbook, Officer Smid noticed that it was missing bill-of-lading information for January 29th and 30th, and the driver reported a significant amount of downtime before loading in Phoenix, Arizona.

20.     Officer Smid requested additional documents from the Defendant and directed him to pull his tractor-trailer rig into an inspection bay at the Gallup Port of Entry.

21.     Defendant complied with these directions but appeared nervous to Officer Smid because his hands were shaking as he turned over his paperwork for inspection.

22.     Defendant drove his tractor-trailer into the inspection bay, allowing Officer Smid to commence the Level 2 safety inspection shortly after 9:30 a.m.

23.     The Gallup Port of Entry's inspection bay, or secondary inspection area, consists of a large indoor garage with doors at both ends that is equipped for conducting a more thorough inspection concerning all areas covered by the State's regulatory scheme, including the vehicle's interior and cargo.

24.     The parameters of a Level 2 safety inspection correspond to the categories of information listed in the State's regulatory scheme and include both a review of paperwork (including the driver's license, medical card, logbook, vehicle registration, bill of lading, and permits) and an inspection of the vehicle itself (including the interior of the cab and sleeper compartment as well as the interior of the trailer and its cargo).

25.     During his inspection of the tractor-trailer rig's exterior, Officer Smid noticed an exhaust leak underneath the cab on the right side.

26.     During his inspection of the vehicle's cab and sleeper berth, Officer Smid noticed a number of cell phones; he also heard one of Defendant's cell phones ringing at frequent intervals during the inspection.

27.     After inspecting the vehicle's cab and exterior, Officer Smid requested that Defendant unlock the trailer so he could inspect its interior; Defendant responded by exiting the cab of the truck and retrieving a set of keys from the ignition.

28.     As Defendant walked back to the rear of the trailer to unlock it with the keys, Officer Smid noticed that Defendant put his head down and clenched his fists.

29.     While at the back of the trailer, Officer Smid asked Defendant if he had observed the trailer being loaded; Defendant answered that he did not, because he dropped the trailer off and picked it up several hours later after it was loaded.

30.     Defendant appeared nervous to Officer Smid while the two men were at the back of the trailer, and Defendant's appearance made Officer Smid apprehensive; accordingly, Officer Smid asked Officer Holona, who was working in the adjoining inspection bay, to watch Defendant while Officer Smid was inspecting the trailer's interior.

31.     Defendant also appeared to Officer Holona to be nervous or angry.

32.     Upon entering the trailer after Defendant opened it, Officer Smid observed a number of black duffel bags in plain view on top of a load of boxes; Officer Holona also observed the duffel bags in plain view from his vantage point outside the trailer.

33.     The boxes appeared to contain furniture and were consistent with the cargo listed on the bill of lading; however, based on the officer's training, experience, and review of Defendant's paperwork, the duffel bags were not part of the load of furniture, and there was no cargo listed on the bill of lading which related to the duffel bags.

34.     Defendant did not claim the duffel bags as his personal property or provide the officers with any explanation for their presence in the trailer.

35.     Officer Smid had conducted prior seizures where contraband was found in black duffel bags, and based on his training and experience he believed that such duffel bags were common in the distribution of illegal narcotics.

36.     As Officer Smid approached the black duffel bags, he began to smell the odor of raw marijuana; this odor became stronger to Officer Smid as he got closer to the duffel bags.

37.     After associating the odor of raw marijuana with the black duffel bags, Officer Smid unzipped one of them and observed a number of bundles wrapped in wood-grain contact paper; this odor became even stronger after Officer Smid unzipped the duffel bag, and in past seizures he had seen the same type of wood-grain contact paper used to bundle bulk marijuana.

38.     Officer Smid then cut open one of the bundles in the duffel bag with his knife, revealing a green leafy substance consistent with the appearance of bulk marijuana.

39.     Upon recognizing that the contents of the bundle was marijuana, Officer Smid directed Officer Holona to place Defendant under arrest.

-7-

40.     After Defendant was placed under arrest and advised his rights under Miranda

v. Arizona, 384 U.S. 436 (1966), Officer Smid seized all of the duffel bags in the trailer and

inventoried their contents, which totaled approximately 550 pounds of marijuana.

41.     Officer Smid's actions with respect to the trailer's interior and cargo remained

within the standard parameters of a Level 2 Safety Inspection up to the point when he

unzipped the duffel bag and saw the bundles consistent with the packaging of bulk

marijuana; by that point, Officer Smid had developed probable cause to believe that

Defendant was using the trailer to transport and distribute a large load of marijuana.

42.     After conducting an inventory of the bulk marijuana in the duffel bags, Officer

Smid turned the investigation over to the Drug Enforcement Administration (DEA), and

Defendant subsequently was indicted on one count of possession with intent to distribute 100

kilograms or more of marijuana.  [Doc. 1.]

43.     The officers' suppression-hearing testimony regarding the above events was

credible.

44.     During his cross-examination of the officers at the suppression hearing,

Defendant's out-of-state counsel did not succeed in impeaching the officers' credibility.

## II.    LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant contends that the officers at the Gallup Port of Entry violated his Fourth

Amendment rights by seizing and searching his tractor-trailer rig on or about January 30,

2008.  In particular, Defendant asserts that he did not consent to the search or seizure, that

the officer's decision to open the trailer and inspect its cargo was not supported by probable

cause or reasonable suspicion, and that the officer was not acting within the proper parameters of a "Level 2 Safety Inspection" when he entered the trailer and began inspecting the black duffel bags.

The Government concedes that Defendant was not involved in a consensual encounter with any of the officers at the port of entry and that the search of the trailer's interior was not consensual. In addition, the Government has not raised the issue of Defendant's Fourth Amendment standing to challenge the search of the trailer, and Defendant's testimony at the suppression hearing indicates that the trucking company, trailer, and trailer lock all belonged to him. For these reasons, the burden shifts to the Government to show that the warrantless search and seizure at the port of entry were reasonable, *i.e.*, that they fit under one or more of the recognized exceptions to the Fourth Amendment's warrant requirement. See United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993).

Defendant's contention that the Government failed to meet this burden largely relies on the mistaken assumption that Officer Smid was required to develop probable cause to search the trailer *before* he opened and entered it for purposes of his safety inspection, and that his testimony was not credible enough to show that he developed probable cause at that time. As noted above, I find that the officers' testimony at the suppression hearing was credible and that the performance of Defendant's out-of-state counsel at the hearing was not successful in impeaching the Government's witnesses. For the reasons set forth below, I also reject the contention that Officer Smid's compliance with the Fourth Amendment depends on whether he developed probable cause *before* he opened and entered the trailer.

It is true that probable cause provides one avenue for justifying the search of a vehicle or trailer.   Under   the "automobile exception" to the Fourth Amendment's warrant requirement, law enforcement officers may search the interior of a vehicle or attached trailer based on probable cause when the vehicle or attached trailer lawfully remains in police custody.  See generally Florida v. Myers, 466 U.S. 380, 382 (1984); Chambers v. Maroney, 399 U.S. 42, 51-52 (1970).  In this regard, the parties do not seriously dispute that Officer Smid developed probable cause to search the duffel bags in the trailer when he entered the trailer and got close enough to smell the odor of raw marijuana emanating from them.  The Tenth Circuit "'has long recognized that marijuana has a distinct smell and that the odor of marijuana alone can satisfy the probable cause requirement to search a vehicle or baggage.'" United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003) (quoting United States v. Morin, 949 F.2d 297, 300 (10th Cir. 1991)).  In particular, this requirement is satisfied when such an odor is detected in the context of a commercial-vehicle inspection where the cargo that is the apparent source of the odor does not appear on the vehicle's bill of lading, and the Defendant does not claim to know its contents.  See United States v. Vasquez-Castillo, 258 F.3d 1207, 1212-13 (10th Cir. 2001).  Once the officer developed probable cause to believe that the black duffel bags contained marijuana, the Fourth Amendment did not require him to apply for or obtain a search warrant before opening them to confirm his suspicion that they in fact contained a controlled substance.  See id.

On the other hand, Defendant is correct that Officer Smid lacked probable cause to search  the black duffel bags *before* he entered the trailer.  Before he required Defendant to

unlock and open the doors to the trailer, Officer Smid's inspection had revealed (1) the safety rating provided by the PrePass System, (2) some minor irregularities in Defendant's logbooks (such as the failure to record the bill-of-lading information and the downtime after loading), (3) Defendant's nervous demeanor (such as shaking hands and clenched fists), (4) Defendant's possession of more than one cell phone and the sound of an unanswered, ringing phone, and (5) the exhaust leak on Defendant's truck.

Even when considered together under the totality of the circumstances, these observed facts do not add up to probable cause to believe that Defendant was secreting evidence of criminal activity in his trailer. Thus, the Government must rely on another exception to the Fourth Amendment's warrant requirement to establish the reasonableness of Officer Smid's decision to open and enter the interior of the trailer and to detain Defendant and his tractor-trailer rig at the port of entry for the period of time leading up to that search.

Contrary to Defendant's contentions, New Mexico's regulatory scheme for conducting warrantless inspections of the commercial trucking industry at its ports of entry provides such an exception. The Tenth Circuit has previously upheld the constitutionality of this regulatory scheme pursuant to the three-part test articulated in New York v. Burger, 482 U.S. 691, 703 (1987). See Vasquez-Castillo, 258 F.3d at 1210. In the present case, as in Vasquez-Castillo, the State of New Mexico has a substantial interest in regulating commercial carriers to protect public safety on the highways, and warrantless safety inspections of commercial tractor-trailer rigs at the State's ports of entry are necessary to further the State's regulatory scheme governing commercial carriers. See id. at 1210-11.

The State's regulatory scheme sufficiently informs commercial carriers that their property will be subject to periodic inspections undertaken for safety purposes and that MTD officers stationed at the State's permanent ports of entry are authorized to perform such safety inspections.  See id. at 1211-12.

The safety inspection at issue here was prompted by the information supplied by the PrePass System.  Both Officer Smid and Defendant testified about the workings of the PrePass System at the suppression hearing on July 14, 2008, and the Court notes that PrePass operates a public website which contains information that is consistent with their testimony. See http://www.prepass.com (last visited July 22, 2008); cf. State ex rel. Dep't of Transp. v. Heavy Vehicle Electronic License Plate, Inc., 157 F. Supp. 2d 1158, 1161 (D. Or. 2001) (summarizing the operation of "a multi-state electronic 'highway screening system' known as 'PrePass'"); O'Toole v. Northrup Grumman Corp., 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web.").

Given Defendant's testimony that he voluntarily obtained his PrePass and was familiar with how it worked, I find Defendant had notice that his tractor-trailer rig and documentation were subject to inspection at participating ports of entry under this automated system.  In addition, the officer's use of the automated PrePass System to aid him in deciding which vehicles to inspect had the effect of "limit[ing] the discretion of inspectors in time, place, and scope," as required under Vasquez-Castillo, 258 F.3d at 1211.

I further determine that Officer Smid followed the standard procedure for a Level 2 safety inspection until the time that he smelled the odor of raw marijuana emanating from the black duffel bags in the trailer and opened one of them.  Although this standard procedure limits the officer's discretion in deciding which areas to search and for what purpose, it does allow the officer to enter the trailer's interior for the purpose of verifying that the cargo matches the information on the bill of lading and is safely loaded.  See N.M. Stat. Ann. §§ 65-5-1(C), (D); Vasquez-Castillo, 258 F.3d at 1212 (finding that an officer "permissibly entered Mr. Vasquez-Castillo's trailer to inspect the blocking and bracing").

While performing these permissible and standardized components of a Level 2 safety inspection, Officer Smid observed the black duffel bags (which did not correspond to the cargo listed on the bill of lading) and smelled the odor of raw marijuana emanating from them.  From that point forward, the officer no longer needed to remain within the parameters of New Mexico's regulatory scheme for conducting warrantless inspections of the commercial trucking industry because he had developed probable cause to initiate a criminal investigation and open the duffel bags, thereby revealing the load of bulk marijuana that is the subject of the *Indictment* in this case.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that the search and seizure of Defendant and his tractor-trailer rig at the Gallup port of entry on or about January 30, 2008, did not violate Defendant's Fourth Amendment rights and do not provide any basis for invoking the exclusionary rule.

-13-

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion to Suppress* [Doc.35] is **DENIED**.

**SO ORDERED** this 12th day of September, 2008, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge